29 A.3d 533

**Norman Bruce DERR**

v.

**STATE of Maryland.**

**No. 6, Sept. Term, 2010.**

Court of Appeals of Maryland.

Sept. 29, 2011.

Reconsideration Denied Oct. 24, 2011.

212

214

Stephen B. Mercer, Assigned Public Defender, Rockville, MD (William G. McLain of David A. Clark School of Law, University of the District of Columbia, Washington, D.C.), on brief, for appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for appellee.

Prof. Aderson B. Francois, Prof. Josephine Ross, Jamell Hamm, Dorianne Mason, Joy Mukoro, Amanda Zubiate, Prof. Brian Gilmore, Howard University School of Law, Clinic Law Center, Washington, D.C., for Amicus Curiae brief of Bruce A. Jackson, John F. Terzano, The Howard University School of Law Criminal Justice Clinic and Civil Rights Clinic.

Cynthia Boersma, Esq., American Civil Liberties Union of Maryland, Baltimore, MD, Teresa Ann Alutto, Esq., Jennifer L. Bragg, Esq., Washington, D.C., for Amicus Curiae brief of American Civil Liberties Union of Maryland.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

GREENE, J.

On June 29, 2006, Appellant, Norman Bruce Derr (Derr), was convicted of multiple sexual offenses in the Circuit Court for Charles County. On appeal, Derr challenges the admission of forensic evidence introduced at trial through the testimony of an expert witness who did not take part in or observe the physical testing of the evidence, or independently determine the test results. In the Court of Special Appeals, Derr presented the following questions for review: [1]

1. Whether Derr's federal and state constitutional rights of confrontation were violated when the State was permitted to introduce the opinion of a serology examiner and the results of DNA testing of biological evidence through the testimony of an expert who did not participate either directly or in a supervisory capacity, without calling the analyst who performed the testing as a witness or showing that the analyst was unavailable and Derr had a prior opportunity to cross-examine? [2]

2. Whether Derr's constitutional and statutory rights to discovery were violated when the State used a statistical

---

[1]. After oral argument in this Court, counsel filed a joint request, which we granted, to delay our issuance of any opinion in this case until after the United States Supreme Court rendered its decision in *Bullcoming v. New Mexico*, —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). The Supreme Court's opinion in *Bullcoming* was filed on June 23, 2011.

[2]. This Court granted *certiorari* on its own motion, prior to the Court of Special Appeals rendering a decision in the case. In the Court of Special Appeals, Appellant separated the first question into two separate questions regarding the DNA and serological testing. We combined the Confrontation Clause challenges into one question because we shall apply the same analysis for all the forensic evidence. Further, because we conclude that the answer to the constitutional issue is dispositive in this case, we shall reverse the judgment of the Circuit Court on that ground. Accordingly, we need not, and do not, address the evidentiary issues presented.

method to describe the rarity of a DNA profile that did not quantify the chance of a coincidental match where the coincidental match number was required to demonstrate the limitation of the State's chosen statistic?

3. Whether a "match" derived from a trawl of a DNA database was sufficient evidence to sustain Derr's convictions in the absence of any other evidence that corroborated his identification as the perpetrator of the offenses?

4. Whether the court erred when it refused to instruct the jury on the meaning of the phrase "reasonable degree of scientific certainty"?

We shall answer the first question in the affirmative. In this case, there are three pieces of evidence and related testimony that implicate the Confrontation Clause: a 1985 serological report, and the DNA analysis from 2002 and 2004. We shall hold that a testimonial statement may not be introduced into evidence without the in-court testimony of the declarant, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witness. Here, the testing procedures and method employed, the DNA profile created, and the conclusion that there is a match are testimonial in nature, and therefore the analyst who performed the DNA testing is a witness subject to confrontation and cross-examination within the meaning of the Confrontation Clause. In addition, the DNA profile and analysis constituted testimonial statements prepared in anticipation of trial, which were offered into evidence through the testimony of a surrogate who did not participate in or observe the testing procedures. Derr was thus not able to confront the witnesses who made testimonial statements against him, and he was not provided with a prior opportunity to cross-examine the witnesses. Therefore, the testimony offered by the surrogate and the admission of the serological reports and DNA evidence were subject to the protections of the Confrontation Clause.[3]

---

3. The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the

## FACTUAL AND PROCEDURAL BACKGROUND

On September 27, 2004, Norman Bruce Derr was charged with multiple sexual offenses relating to the rape of Alida Berman on December 9, 1984.[4] At the time of the rape, the victim was transported to Physicians Memorial Hospital where she was examined by a nurse and a physical evidence recovery kit (PERK) was used to collect biological evidence. Using the PERK, the nurse collected a genital swab, two vaginal swabs, and an anal swab. The physical evidence was taken to the FBI crime lab for serological testing, which was performed by the lab technician who was a serological examiner. In 1985, the serological examiner conducted serological testing, identified sperm and semen on parts of the swabs, and detailed his findings in a serological report. Despite the testing and other investigation, the case remained unsolved and became inactive.

Seventeen years later, in 2002, a detective reviewed the case and submitted the PERK to the FBI crime lab for forensic analysis. Dr. Maribeth Donovan, an FBI DNA analyst, performed the DNA analysis of the biological evidence. A DNA profile of the suspect, consisting of thirteen genetic markers, was generated from the DNA on the vaginal swabs. This profile was entered into a national database containing 2.5 million DNA profiles, referred to as the Combined DNA Identification System (CODIS). In 2004, a match was discov-

---

witnesses against him[.]" U.S. Const. amend. VI. The same right is secured by Article 21 of the Maryland Declaration of Rights, which states that "in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him ... [and] to examine the witnesses for and against him on oath[.]" *See Crawford v. State*, 282 Md. 210, 211, 383 A.2d 1097, 1098 (1978). In *Crawford v. Washington*, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 1365–66, 158 L.Ed.2d 177, 194 (2004), the Supreme Court of the United States held that testimonial statements are subject to the protections of the Confrontation Clause and cannot be admitted without live testimony, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.

4. Derr was charged with rape in the first degree, sexual assault in the first degree, assault with intent to commit rape, and two counts of a third degree sexual offense.

ered between Derr's existing profile in CODIS and the profile generated in 2002 by Dr. Donovan. The State then obtained a search warrant to seize additional DNA from Derr, in order to create a new "reference DNA sample" and to verify that Derr's profile in CODIS was accurate. The testing of the new sample was performed by an unnamed team of biologists and supervised by Dr. Jennifer Luttman, a DNA analyst with the FBI, in 2004. Upon interpretation of the biologists' results, Dr. Luttman determined that the reference sample matched Derr's profile in CODIS. Dr. Luttman was not, however, involved with the 1985 serological testing or the 2002 DNA testing of the PERK that resulted in the DNA profile of the alleged assailant. Further, Dr. Luttman did not perform the actual DNA testing in 2004, but rather merely "supervised" or reviewed her team's analysis, with no indication that she observed the "bench work"[5] at the time it was performed by her team. Based on the match between Derr's CODIS profile and the DNA profile obtained from the DNA analysis of the evidence, Derr was arrested and charged with the crimes mentioned.

The defense filed preliminary motions in the Circuit Court for Charles County challenging the admission of Dr. Luttman's proposed testimony. Two hearings were held *in limine* to determine whether the State could introduce the opinion of the serological examiner and the results of the PERK analysis solely through the use of "surrogate testimony," with Dr. Luttman as the surrogate. The term "surrogate testimony" refers to expert testimony rendered by a lab supervisor, rather than by the analyst who performed the tests. Derr argued that he had a right under the Confrontation Clause to confront and cross-examine the original analysts. The Circuit Court ruled that the serological report was not testimonial and

---

5. With regard to the meaning Dr. Luttman attached to the term "bench work," she stated in her testimony, "The biologists are the people who go into the laboratory and actually do what we call the wet chemistry. They're the ones who look at the items of evidence and then examine those items for blood and semen and then do the DNA testing. They give me then all of their results and I'm the one who does all of the interpretation."

was, therefore, admissible through Dr. Luttman under the business records exception to the hearsay rule [6] and under Maryland Rule 5–703 [7] as the basis of Dr. Luttman's expert opinion. The court also ruled that, while the opinion of the DNA analyst from 2002 was testimonial, the underlying analysis of the DNA was nontestimonial and was admissible both as a business record and as the basis of Dr. Luttman's opinion. At trial, the State did not request that Mrs. Berman, the alleged victim, make an in-court identification of Derr or identify him as the assailant based on photos of Derr taken in 1982 and 1986, which were entered into evidence. The State also did not call the serological examiner or Dr. Donovan, the FBI DNA analyst who performed the 2002 DNA testing, to connect Derr to the results of the investigation in this case.

---

**6.** Maryland Rule 5–803 defines hearsay exceptions as those statements which are "not excluded by the hearsay rule, even though the declarant is available as a witness." Md. Rule 5–803(b)(6) encompasses the "business records exception," which delineates those statements that are considered "[r]ecords of regularly conducted business activity" and are therefore admissible as an exception to the hearsay rule:

A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation.

**7.** Md. Rule 5–703 explains the proper basis of opinion testimony by experts. The Rule states:

(a) **In general.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

(b) **Disclosure to jury.** If determined to be trustworthy, necessary to illuminate testimony, and unprivileged, facts or data reasonably relied upon by an expert pursuant to section (a) may, in the discretion of the court, be disclosed to the jury even if those facts and data are not admissible in evidence. Upon request, the court shall instruct the jury to use those facts and data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference.

Instead, the State relied solely on testimony from Dr. Luttman, who was accepted by the court as an expert in the fields of forensic serology and forensic DNA analysis, and who was permitted to testify regarding the 1985, 2002, and 2004 testing results. During her testimony, Dr. Luttman explained the procedure for identifying sperm and semen, as well as the procedure for creating a DNA profile. Dr. Luttman also testified regarding the opinion of the 1985 serologist and the DNA testing procedures and results of the 2002 test. She testified that it was her opinion, based on the tests conducted, that Derr's DNA profile matched that of the suspect. She supported her opinion by stating it was based on a "reasonable degree of scientific certainty." The jury found Derr guilty of four counts relating to the sexual assault of Mrs. Berman.[8] Derr filed a timely appeal to the Court of Special Appeals. Appellate argument in the intermediate appellate court was deferred while the Supreme Court of the United States considered *Melendez–Diaz v. Massachusetts,* 557 U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (*Melendez* ). Subsequently, this Court granted *certiorari* on its own motion, prior to the Court of Special Appeals rendering a decision in the case.

## DISCUSSION

### A. DNA Evidence

In order to determine the application of Confrontation Clause principles to a DNA case, a brief explanation of the tests performed and the procedures followed is necessary. In describing the science of DNA evidence, we have said:

> Deoxyribonucleic acid ('DNA') is the organic material that provides the genetic instructions for all individual hereditary characteristics. The importance of DNA for forensic purposes is that DNA does not vary within an individual

---

8. Derr was found guilty of first degree rape and the lesser included offense of second degree rape; he was also found guilty of a first degree sexual offense and the lesser included offense of second degree sexual offense. He was acquitted of two counts of a third degree sexual offense.

and, with the exception of identical twins, no two individuals have the same DNA configuration.

The molecular structure of DNA is commonly referred to as a 'double helix,' which resembles a spiraling ladder, and which is composed of twisted double strands of repeated sequences of 'nucleotides.' The sides of the ladder are composed of the 'nucleotides,' which are organic bases that pair with one another to form the 'rungs' of the double helix. It is the repeating sequence of base pairs along the DNA double helix that comprise 'genes,' which determine the unique physiological traits of human beings. The specific position that a gene occupies is called its 'locus.' An individual's entire complement of DNA is known as the 'genome.'

The vast majority of the base pair sequences of human DNA are identical for all people. There are, however, a few DNA segments or genes, called 'polymorphic loci,' which are highly variable among individuals. The alternative forms of these individual polymorphic gene fragments are called 'alleles.' It is these polymorphisms that have great significance for forensic DNA analysis because they provide the basis for DNA identification.

*Young v. State,* 388 Md. 99, 106–07, 879 A.2d 44, 48–49 (2005) (internal citations omitted) (quoting *Gross v. State,* 371 Md. 334, 339–40 n. 1, 809 A.2d 627, 630 n. 1 (2002)). The DNA analysis begins when a sample is transported to a DNA laboratory by law enforcement personnel. Office of the Inspector General, *The FBI DNA Laboratory: A Review of Protocol and Practice Vulnerabilities* (May 2004), http://www. justice.gov/oig/special/0405/index.htm [hereinafter *FBI Protocol* ]. Forensic scientists visually examine the evidence for indications of bodily fluid which may contain DNA evidence. *Id.* The scientists then perform tests to determine if DNA is present. *Id.* Typically, a cotton swab is used to remove dried body fluid, and the DNA is extracted from the cotton swab. *Id.*

The common procedure used in DNA analysis is called polymerase chain reaction (PCR), which is "an amplification

procedure that reproduces repeatedly a short segment of DNA, making it possible to analyze minute or degraded samples." *Young*, 388 Md. at 108, 879 A.2d at 49. Further,

PCR analysis begins with a three-step process to amplify the DNA sample: (1) denaturization (the DNA is heated to separate the two strands); (2) annealing (primers containing nucleotide sequences that are complementary to the DNA region being amplified are added to the DNA sample, which bond to the gene when cooled); (3) extension (the gene is "copied" repeatedly in order to produce a larger sample of DNA for analysis).

\*     \*     \*

Once PCR amplification has been completed, analysis of the DNA profile and match determination can be conducted through the utilization of several different genetic markers. The markers employed by the laboratory in the instant case are short tandem repeats ("STR"). STRs are DNA sequences consisting of two to six base pairs. STRs particularly are useful in analyzing small DNA samples, because loci containing STRs are present with great frequency throughout the chromosomes. The loci have a large number of alleles and usually are susceptible to unique identification. The FBI has designated thirteen core STR loci and a sex-typing marker (amelogenin) for identification in its national database of convicted felons, the Combined DNA Index System ("CODIS").

DNA profiling typically is used to compare a suspect's DNA with a sample of DNA taken from a crime scene. "DNA profiling" is a catch-all term for a wide range of methods employed to study genetic variations, including RFLP and PCR/STR typing. All types of DNA analysis involve three basic steps: (1) processing or typing of the DNA samples (to produce x-ray films that indicate the lengths of the polymorphic fragments); (2) match determination (comparison of the films to determine whether any sets of fragments match); and (3) statistical analysis (to determine the statistical significance of any match between the two DNA samples). This three-step process produces

two distinct, but interrelated, types of information: (1) molecular biological information (whether a match exists between an unknown DNA sample and a sample taken from a suspect); and (2) population genetics information (if a match exists, the statistical probability that the unknown sample came from a third party with the same DNA pattern as the suspect).

DNA evidence cannot be attributed conclusively to one person unless examiners analyze the entire DNA molecules of the DNA evidence and the DNA sample from that person respectively. Two unrelated individuals can have identical DNA fragments that are examined in a particular type of DNA analysis—*i.e.,* identical DNA patterns at the targeted loci. The underlying theory of the forensic use of DNA testing is that as the number and variability of the polymorphisms analyzed increases, the odds of two people coincidentally sharing the same DNA profile becomes vanishingly small.

Therefore, when a DNA "match" has been declared, a conclusive identification of a crime suspect as the source of the unknown DNA sample is not being made. Rather, the suspect simply has been "included" as a possible source of the DNA material, because the suspect's DNA sample has matched the crime scene DNA sample at a certain number of critical alleles.

*Young,* 388 Md. at 108–11, 879 A.2d at 49–51.

It is important to explain what a DNA profile is composed of, and how it is created. As referenced above, the DNA is heated to separate the nucleotides. The chemical in which the DNA is heated contains markers that identify "the starting and ending points of the DNA fragment that is duplicated." *FBI Protocol.* After the DNA fragments are copied, the fragments are sorted according to length in a process called electrophoresis. *Id.* Special software measures the length of the varying DNA fragments. *Id.* This process produces "an electropherogram, or graph that displays a series of different-colored peaks of different heights." *Roberts v. United States,* 916 A.2d 922, 927 (D.C.2007). The electropherogram reveals

the primers used during amplification which contain fluorescent markers. "The machine and the software then represent the lengths of the various fragments as peaks on a graph...." *FBI Protocol.* Specifically:

> [S]oftware has two components, GeneScan® and Genotyper®. Data viewed in GeneScan®, as appears above, is the raw, unanalyzed, collection data that reflects everything the laser detects, including interference that is common in electrophoresis instruments (Genescan® data). Genotyper® allows forensic scientists to take GeneScan® data and display it in a format that conceals background noise and peripheral information, and to focus their review on the results of the control and evidence samples.

*FBI Protocol.* A DNA analyst, or examiner, interprets the data displayed on the electropherogram, which reveals the alleles seen at all the examined loci. *Roberts,* 916 A.2d at 927. The DNA examiner then works with the Genotyper graph and documents the allele values at each chromosomal location or loci, forming the DNA profile. *FBI Protocol.* This DNA profile is then compared to profiles from known individuals or inputted into CODIS to find a match within the database, which contains DNA profiles obtained from known sources. *See Roberts,* 916 A.2d at 927. With this information in mind, we turn to the legal implications and requirements of DNA evidence.

## B. Applicable Law and Legal Precedent

The Sixth Amendment provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The same right is secured by Article 21 of the Maryland Declaration of Rights, which states that "in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him ... [and] to examine the witnesses for and against him on oath[.]" *See Crawford v. State,* 282 Md. 210, 211, 383 A.2d 1097, 1098 (1978). As we have stated, "[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous

than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *State v. Breeden*, 333 Md. 212, 219, 634 A.2d 464, 467 (1993) (quoting *Barber v. Page*, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255, 258 (1968)). Further, "[t]wo significant purposes lie at the core of the right of confrontation. One is to provide the defendant with an adequate opportunity for cross-examination. The other purpose is to give the judge and jury opportunities to observe the testifying witness's demeanor." *Breeden v. State*, 95 Md.App. 481, 495–96, 622 A.2d 160, 167 (1993) (internal citations omitted), *aff'd, State v. Breeden*, 333 Md. 212, 634 A.2d 464 (1993); *see Crawford*, 282 Md. at 214, 383 A.2d at 1099 (asserting that the primary purpose of requiring confrontation is to prevent depositions and other non-live testimony from being used against an accused in lieu of a personal examination and cross-examination of the witness).

In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court of the United States set forth a framework for evaluating violations of the Confrontation Clause of the Sixth Amendment.[9] *Crawford*, 541 U.S. at 50–56, 124 S.Ct. at 1363–67, 158 L.Ed.2d at 192–96. The Court stated that the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364, 158

---

**9.** As the Court in *Crawford* discussed:

> [N]ot all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.

*Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 193. Thus, hearsay and the Confrontation Clause present two separate evidentiary hurdles which must both be satisfied before a piece of evidence may be properly admissible at trial. Because our analysis of the Confrontation Clause issue is dispositive, as it pertains to each of the three pieces of evidence discussed, we do not address the hearsay component.

L.Ed.2d at 192. Quoting the American Dictionary of the English Language from 1828, the Court defined testimony as " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* The Court went on to state that the purpose of the Confrontation Clause was to protect against out-of-court statements, specifically formal statements to government officers, being admitted without an opportunity to confront the declarant. *Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 193. *Crawford* concluded that testimonial statements are subject to the protections of the Confrontation Clause and cannot be admitted without live testimony, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford,* 541 U.S. at 53–54, 124 S.Ct. at 1365–66, 158 L.Ed.2d at 194.

In defining the term "testimonial statement," the Court in *Crawford* stated:

Various formulations of this core class of "testimonial" statements exist: *ex parte* in-court testimony *or its functional equivalent*—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or *similar pretrial statements that declarants would reasonably expect to be used prosecutorially;* extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; *statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.* These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. (Emphasis added.) (Internal citations and quotations omitted.)

*Crawford,* 541 U.S. at 51–52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193. Hence, in *Crawford,* the Court referred to the purpose of the use of material in a later trial in two contexts. First, "pretrial statements that declarants would reasonably expect to be used prosecutorially," and second, "statements that were made under circumstances which would lead an

objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* (internal citations and quotations omitted). The Court subsequently held in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), that if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," then the statement is testimonial. *Davis,* 547 U.S. at 822, 126 S.Ct. at 2274, 165 L.Ed.2d at 237. In contrast, statements "are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis,* 547 U.S. at 822, 126 S.Ct. at 2273, 165 L.Ed.2d at 237. Likewise, in *Michigan v. Bryant,* 562 U.S. ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93, 107 (2011), the Court held that "[w]hen, as in *Davis,* the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause." The Court further stated that "[t]he existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' *Davis,* 547 U.S. at 822, 126 S.Ct. [at 2274,] 165 L.Ed.2d [at 237]." *Bryant,* 562 U.S. at ——, 131 S.Ct. at 1157, 179 L.Ed.2d at 109. These cases combined reveal the Court's emphasis on the purpose for which a statement was made in determining its testimonial nature.

Subsequently, in *Melendez,* the trial court "admitted into evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." *Melendez,* 557 U.S. ——, 129 S.Ct. 2527, 2530, 174 L.Ed.2d 314, 319 (2009). At trial, the prosecution placed into evidence the three certificates of analysis, which were certified by the analysts who performed the drug testing, but without the testimony of the analysts or any other witness qualified to testify about the methods used or the results obtained. *Melendez,* 557 U.S. at ——, 129 S.Ct. at

2531, 174 L.Ed.2d at 320. In *Melendez,* the United States Supreme Court held that the certificates of drug analysis were testimonial because "there is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements'" as defined by *Crawford. Melendez,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 321. The Court explained that the certificates were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,'" opining that had an analyst been called, he or she would have been expected to testify as to the identity and weight of the substance, which was the precise evidence presented by the certificates. *Id.* (quoting *Davis,* 547 U.S. at 830, 126 S.Ct. at 2278, 165 L.Ed.2d at 242). The Court continued that the certificates were "quite plainly affidavits" because they were "incontrovertibly a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* (quoting *Crawford,* 541 U.S. at 51, 124 S.Ct. at 1364, 158 L.Ed.2d at 192). The Court further stated:

> [N]ot only were the affidavits "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Crawford,* 541 U.S. at 52, 124 S.Ct. [at 1364], 158 L.Ed.2d [at 193], but under Massachusetts law the *sole purpose* of the affidavits was to provide "prima facie evidence of the composition, quality, and the net weight" of the analyzed substance[.] (Emphasis in original.)

*Id.* (quoting Mass. Gen. Laws ch. 111, § 13). Thus, "[t]he analysts who swore the affidavits provided testimony against Melendez–Diaz, and they are therefore subject to confrontation[.]" *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2537 n. 6, 174 L.Ed.2d at 327 n. 6. Further, in *Melendez,* the Court noted that "[l]ike expert witnesses generally, an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination." *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2537, 174 L.Ed.2d at 327.

In *Melendez,* the Court made two important conclusions relevant to our analysis here: "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for

purposes of the *Sixth Amendment." Melendez,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 322. The Court therefore held that the certificates were inadmissible absent the analysts' testimony or a showing that they were unavailable and that the defendant had a prior opportunity to cross-examine. *Id.* The holding in *Melendez* left unanswered the question of how to apply the principle to cases involving surrogate testimony, where a supervisor for a lab testifies, but the actual person who created the data or report does not.

Recently, in *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the United States Supreme Court held that "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution" is testimonial and therefore the accused has the right to be confronted with the analyst who performed the testing. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2713–14, 180 L.Ed.2d at 620. The Court also stated that *Melendez* "refused to create a 'forensic evidence' exception to [the rule in *Crawford* that testimonial statements are not admissible unless the declarant is unavailable and the defendant has a prior opportunity to cross-examine]." *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2713, 180 L.Ed.2d at 620. In *Bullcoming,* the evidence against the petitioner included a forensic laboratory report certifying Bullcoming's blood-alcohol concentration. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2709, 180 L.Ed.2d at 617. At trial, the State did not call as a witness the analyst who performed the test and signed the certification; rather, over defense objection, the State called to testify "another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test" to introduce into evidence the test results. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2709, 180 L.Ed.2d at 618.

In *State v. Bullcoming,* 147 N.M. 487, 226 P.3d 1, 8–9 (2010), the New Mexico Supreme Court held that although the laboratory report introduced at Bullcoming's trial was testimonial under *Melendez,* the report was validly admitted because the analyst was a "mere scrivener," and therefore the surrogate testimony was sufficient to satisfy Bullcoming's confron-

tation right. The United States Supreme Court granted *certiorari* to answer the question:

> Does the Confrontation Clause permit the prosecution to introduce a *forensic laboratory report* containing a *testimonial certification*, made in order to *prove a fact at a criminal trial*, through the in-court testimony of an analyst *who did not sign the certification or personally perform or observe the performance* of the test reported in the certification. (Emphasis added.)

*Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2713, 180 L.Ed.2d at 619. In answering the question, the Court held:

> As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness.

*Id.*

Accordingly, the United States Supreme Court reversed the holding of the New Mexico Supreme Court. The Court first addressed the issue of surrogate testimony, and New Mexico's holding that the analyst merely transcribed the results generated by the machine without interpretation or independent judgment. *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2714, 180 L.Ed.2d at 619–20. The Court stated that the certification "reported more than a machine-generated number," and went on to list all of the representations made in the report "relating to past events and human actions not revealed in raw, machine-produced data[.]" *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2714, 180 L.Ed.2d at 621. The Court held that such representations are "meet for cross-examination" and continued that even if the certification was just a machine-generated number, "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar." *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2714–15, 180 L.Ed.2d at 621.

The Court, explaining why surrogate testimony does not satisfy the Confrontation Clause, noted that the testimony "of

the kind [the expert] was equipped to give could not convey what [the analyst] knew or observed about the events his certification concerned, *i.e.,* the particular test and testing process he employed." *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2715, 180 L.Ed.2d at 622. The Court concluded that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2715, 180 L.Ed.2d at 621 (quoting *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2537 n. 6, 174 L.Ed.2d. at 327 n. 6). Accordingly, the Court held that "the [Confrontation] Clause does not tolerate dispensing with confrontation simply because the [trial] court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination," highlighting the premise that " 'the purpose of the rights set forth in [the Sixth] Amendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair.' " *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2716, 180 L.Ed.2d at 622 (quoting *United States v. Gonzalez–Lopez,* 548 U.S. 140, 145, 126 S.Ct. 2557, 2562, 165 L.Ed.2d 409, 417 (2006)). The Supreme Court concluded that "no substitute procedure can cure the violation" and therefore the surrogate testimony at issue in the case violated the Confrontation Clause. *Id.*

*Bullcoming* clarified the Confrontation Clause analysis regarding forensic testing that began in *Melendez.* In *Melendez,* the Court held that drug analysis certificates were testimonial because the contents of the certificates were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,' " and the statements were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 321 (citations omitted). The Court in *Melendez* thus held that the certificates were inadmissible absent the analysts' testimony or a showing that they were unavailable. *Melen-*

*dez*, 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 322. Following *Melendez*, in *Bullcoming* the Supreme Court further explained the definition of testimonial as including those statements "made for the purpose of proving a particular fact." *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2710, 180 L.Ed.2d at 616. In explaining *Melendez*, the Court in *Bullcoming* stated that the report in *Melendez* "had been created specifically to serve as evidence in a criminal proceeding" and therefore could not be introduced without "offering a live witness competent to testify to the truth of the statements made in the report." *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2709, 180 L.Ed.2d at 615. The Court also stated that such reports are testimonial because they are "created solely for an 'evidentiary purpose,'" *i.e.*, "in aid of a police investigation[.]" *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2717, 180 L.Ed.2d at 623.

Although the Supreme Court has not yet answered the specific question of who must testify in cases involving scientific analysis, it has provided guidance as to which people involved with a case are witnesses whose statements will be considered testimony against the accused. The Commonwealth of Massachusetts and the dissent in *Melendez* argued vigorously that there are certain types of witnesses who are exempt from the requirements of the Confrontation Clause. The majority, however, rejected each of the justifications in turn. *See Melendez*, 557 U.S. at ——, 129 S.Ct. at 2533–40, 174 L.Ed.2d at 323–30. First, the Court rejected the argument that the analysts are not "accusatory" witnesses and are thereby not the type of witnesses covered by the Confrontation Clause. *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2533–34, 174 L.Ed.2d at 323. Massachusetts based this argument on the notion that an analyst is not accusatory because his or her testimony is only inculpatory when considered in conjunction with other evidence. The Court dispelled this theory, stating that "there is not a third category of witnesses [*i.e.*, non-accusatory], helpful to the prosecution, but somehow immune from confrontation." *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2534, 174 L.Ed.2d at 323. The Court read the Clause to

literally mean that the defendant has the right to be confronted with *the* witnesses against him or her, and stated that the Clause only "contemplates two classes of witnesses—those against the defendant and those in his favor. The prosecution *must* produce the former[.]" *Id.*

The Court also rejected a claim that the Confrontation Clause applies only to "conventional" witnesses. *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2535, 174 L.Ed.2d at 324–25. The dissent in *Melendez* advanced three reasons why analysts were not conventional witnesses: analysts report near contemporaneous observations (as opposed to relating events observed in the past), analysts do not have personal knowledge of the crime, and analysts' statements are not the product of interrogation. *Id.* The Court rejected each argument in turn, stating that none of these contentions had adequate support in case law, and emphasizing that the determining factor is that the analysts were witnesses *against* the defendant and were responding to a police inquiry, not whether they were "conventional." *Id.*

Most importantly, the Court rejected the contention that analysts were somehow neutral witnesses based on the scientific nature of their statements. *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2536–38, 174 L.Ed.2d at 325–328. The Court held that the supposed reliability of scientific evidence is not sufficient grounds to admit such statements absent live testimony. *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2536–37, 174 L.Ed.2d at 326–27. Rather, "there are other ways—and in some cases better ways—to challenge or verify the results of a forensic test. But the Constitution guarantees one way: confrontation. We do not have license to suspend the Confrontation Clause when a preferable trial strategy is available." [10] *Melendez,*

—————

**10.** The Court noted in a footnote that there are not always better ways to challenge the results. In making this observation, the Court referred to autopsies and breathalyzer tests that cannot be repeated, as well as tests performed on specimens that have been lost or degraded. *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2536 n. 5, 174 L.Ed.2d at 326 n. 5. This footnote seems to imply that the Confrontation right is even more

557 U.S. at ——, 129 S.Ct. at 2536, 174 L.Ed.2d at 326. The Court also stated, "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2537, 174 L.Ed.2d at 326. The Court then detailed the deficiencies of forensic evidence, highlighting the need to question the person who actually performed the test. In rejecting the idea of separate classes of witnesses, the Supreme Court emphasized the importance of confronting the person actually responsible for the testimonial statements. *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2537–38, 174 L.Ed.2d at 326–27. *See United States v. Moore*, 651 F.3d 30, 71, 73–74 (D.C.Cir.2011) (applying *Bullcoming* to support the court's holding that the testimony at trial of a medical examiner and a forensic chemist regarding autopsy reports and drug analyses, respectively, was testimonial evidence that implicated the Confrontation Clause because the witnesses neither performed nor observed the underlying tests about which the reports concerned, and those reports were admitted into evidence).

■ Prior to *Bullcoming* and *Melendez*, this Court endorsed a purpose-driven test when we held that the proper test for determining if a statement is testimonial focuses on whether the statement was "made under circumstances that would lead an objective declarant reasonably to believe that the statement would be available for use at a later trial." *State v. Snowden*, 385 Md. 64, 83, 867 A.2d 314, 325 (2005). We evaluated a Confrontation Clause challenge in *Rollins v. State*, 392 Md. 455, 496, 897 A.2d 821, 845–46 (2006), and held that the autopsy reports at issue were business records and were not testimonial based on relevant statutory requirements. We stated that the Supreme Court "indicated in *Crawford* that the hearsay exceptions, such as the business records exception, can exempt evidence from scrutiny under the Confrontation Clause." *Rollins*, 392 Md. at 479, 897 A.2d at 835. Subsequent to our opinion in *Rollins*, however, the

—————

important in these types of cases because it is the only method to verify the results.

Supreme Court's holding in *Melendez* undercut this line of reasoning, as it specifically stated that the business records exception would not permit an otherwise inadmissible testimonial statement to be admitted. *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2539–40, 174 L.Ed.2d at 329–30. The Supreme Court pointed out that although documents kept in the regular course of business are ordinarily admitted into evidence under the hearsay exception, this will not be the case "if the regularly conducted business activity is the production of evidence for use at trial." *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2538, 174 L.Ed.2d at 328. The Court further related this distinction to police reports, stating that "[t]he analysts' certificates—like police reports generated by law enforcement officials—do not qualify as business or public records[.]" *Id.* Therefore, the testimonial nature of a statement must be determined under the guidelines set forth in *Crawford*, *Melendez*, and *Bullcoming*, and whether the statement falls under a hearsay exception is irrelevant. For example, in *Rollins*, we held that the autopsy reports qualified under the business records exception to the hearsay rule because the records were kept "during the regularly conducted business activity of the Office of the Chief Medical Examiner," as sanctioned by statute.[11] *Rollins*, 392 Md. at 482–83, 897 A.2d at 837. We also stated that, although an autopsy report "might eventually be used in a criminal trial, [the report] was not created for that express purpose, and was statutorily required to be determined by the medical examiner . . . ." *Rollins*, 392 Md. at 484, 897 A.2d at 838.

◼ Under *Melendez* and *Bullcoming*, however, it is now clear that the "express purpose" of the statement need not be

---

11. *See* Md.Code (1982, 2009 Repl.Vol.), § 5–311(a) of the Health–General Article:

(a) *Content.*—(1) The Office of the Chief Medical Examiner shall keep complete records on each medical examiner's case.

\*    \*    \*

(b) *Report of medical examiner and autopsy.*—(2) The original report of the medical examiner who investigates a medical examiner's case and the findings and conclusions of any autopsy shall be attached to the record of the medical examiner's case.

for later use at trial, but instead, any statement that was " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' " is considered to be testimonial. *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 321 (quoting *Crawford,* 541 U.S. at 52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193). The statute under which autopsy reports are completed, Md.Code (1982, 2009 Repl.Vol.), § 5–311 of the Health–General Article, clearly contemplates that the declarant in an autopsy report, the medical examiner or assistant, would reasonably expect the report to be used prosecutorially in the case of any non-accidental or assisted death. Subsection (c) of the statute itself requires the medical examiner to deliver a copy of the report to the State's Attorney when the "medical examiner considers further investigation advisable." Consequently, to the extent *Rollins* was undermined by *Melendez* with regard to the business records exception, *Rollins* is no longer good law.

### C.   Confrontation Clause Analysis as Applied to DNA Evidence

When reviewing a case under the Confrontation Clause, the following principle must be followed: a testimonial statement may not be introduced into evidence, through admission or testimony, without the in-court testimony of the declarant. A court must first identify what statements are being offered as evidence in a criminal trial. Then, a court must determine whether the statements are testimonial in nature. Unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination, when "an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial," and its admission invokes the Confrontation Clause. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2713, 180 L.Ed.2d at 619. This is because "the prosecution may not introduce such [evidence] without offering a live witness competent to testify to the truth of the statements made in the report." *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2709, 180 L.Ed.2d at 615. In the case of

DNA testing, the DNA profile is a statement of the analyst that essentially says: "This is the DNA profile for this person." If the DNA profile is inputted into CODIS and a match is obtained, then that match is derived from the statement of the analyst. In light of *Bullcoming* and *Melendez*, it is inescapable that the testing procedures and method employed, the DNA profile created, and the conclusion that there is a match are testimonial in nature, and therefore the analyst who performed the DNA testing or the supervisor who observed the analyst perform the DNA testing must testify in order to satisfy the Confrontation Clause, unless the witness is unavailable and the defense had a prior opportunity to cross-examine the witness. *See Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2713–17, 180 L.Ed.2d at 619–24.

■ We reach this conclusion for several reasons. First, the DNA profile and report are made for the primary purpose of establishing facts relevant to a later prosecution, and an objective analyst would understand that the statements will be used in a later trial. Stated differently, the analyst who generated the report must have known that the purpose of the testing was ultimately to establish the perpetrator's identity through DNA evidence. Second, the testing results, and the resulting DNA profile, can be considered an affidavit because they are the functional equivalent of in-court testimony, offered to establish *prima facie* evidence of guilt, which constitutes formalized testimonial material. Third, the statements produced by DNA testing are testimony under *Crawford* because the statements are solemn declarations made to prove a fact, namely the identification of the sample and possible match. Finally, the analyst who performs the DNA analysis is a witness for the purpose of the Confrontation Clause because the DNA profile created is a representation "relating to past events and human actions not revealed in raw, machine-produced data[.]" *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2714, 180 L.Ed.2d at 621. Therefore, the DNA profiles created by lab analysts, the reports they produce, and the conclusions or opinions they form contain testimonial

statements that are subject to the requirements of the Confrontation Clause.[12]

---

12.  We are not alone in our determination that DNA reports are testimonial and subject to the Confrontation Clause. For example, in *People v. Payne*, 285 Mich.App. 181, 774 N.W.2d 714, 726 (2009), the court held: [I]t is clear to us that the nontestifying analyst who generated the reports in the present case must have known that the purpose was to ultimately establish the perpetrator's identity through DNA evidence. Although the witnesses who actually testified concerning the laboratory reports at issue here had basic knowledge concerning DNA testing and the methods used to prepare the reports in general, they had not personally conducted the testing, had not personally examined the evidence collected from the victims, and had not personally reached any of the scientific conclusions contained in the reports. Similarly, in *Roberts v. United States*, 916 A.2d 922, 937–39 (D.C.2007), the court held that the Confrontation Clause is violated when a DNA expert testifies based on DNA test results that were performed by a nontestifying DNA analyst.

Further, the Supreme Court of the United States has vacated and remanded two State court opinions that allowed the surrogate testimony of an expert who did not perform the actual testing. In *State v. Crager*, 116 Ohio St.3d 369, 879 N.E.2d 745, 746–48 (2007), the Ohio Supreme Court upheld a ruling of the trial court that allowed testimony regarding the results of a DNA test by an expert who had engaged in a "technical review" of the work of the analyst who had actually performed the blood test and generated the DNA profile. The trial court admitted the reports under the business records exception to the hearsay rule, a rationale that was expressly discredited in *Melendez*. Compare *Crager*, 879 N.E.2d at 751, *with Melendez*, 557 U.S. at ——, 129 S.Ct. at 2539–40, 174 L.Ed.2d at 329. *Crager* was vacated and remanded by the Supreme Court without a written opinion. *Crager v. Ohio*, —— U.S. ——, 129 S.Ct. 2856, 174 L.Ed.2d 598 (2009). Similarly, in *People v. Barba*, No. B185940, 2007 WL 4125230, *1, *6–7, 2007 Cal.App. Unpub. LEXIS 9390, at *3, *20–21 (Cal.Ct.App. Nov. 21, 2007), the lab director for a DNA lab testified as to the procedures and results of testing performed by another analyst, and the California Court of Appeal for the Second District upheld the admission of the evidence against a Confrontation Clause challenge. The defendant appealed the decision of the California Court of Appeal for the Second District to the Supreme Court of California, but the petition for review was denied. *People v. Barba*, No. S 159091, 2008 Cal. LEXIS 2502 (Cal. Feb. 27, 2008). The defendant then petitioned for writ of certiorari to the Supreme Court of the United States; the petition was granted, and the judgment was vacated and the case remanded to the California Court of Appeal for the Second District in light of *Melendez*. *Barba v. California*, —— U.S. ——, 129 S.Ct. 2857, 174 L.Ed.2d 599 (2009). On remand to the California Court of Appeal for the Second District, the court found that *Melendez* was distinguishable from the facts in *Barba*, and thus the court held, once again, that the Confrontation Clause had

In reaching this holding, we find support in the jurisprudence of the District of Columbia Court of Appeals, which has determined repeatedly that DNA evidence is comprised of the conclusions, and therefore the testimonial statements, of the analysts who performed the testing, and is thus subject to the Confrontation Clause. *Gardner v. United States*, 999 A.2d 55, 58–59 (D.C.2010); *Veney v. United States*, 936 A.2d 811, 831 (D.C.2007); *Roberts v. United States*, 916 A.2d 922, 938 (D.C. 2007). In each of these cases, an expert testified as to his or her own "conclusions" based on DNA testing results, despite the fact that the expert took no part in the actual testing. *Roberts* is particularly instructive because, similar to the case at bar, the defendant in *Roberts* argued that the expert relied on the conclusions of others in forming his opinion, while the government countered that the expert performed an independent analysis based on the raw data produced by the analysts, and that the admission of the evidence was valid under Federal Rule of Evidence 703. *Roberts*, 916 A.2d at 937–38. The facts in *Roberts* were as follows:

> Dr. Baechtel was not the original examiner; that job had been performed by Dr. Maribeth Donovan, who no longer worked for the FBI and was not called as a witness by either side. As Dr. Baechtel acknowledged, he had not done the original "hands-on work" in the case and in a

not been violated. *People v. Barba*, No. B185940, 2010 WL 571950, at *10, 2010 Cal.App. Unpub. LEXIS 1279, at *33 (Cal.Ct.App. Feb. 19, 2010). The defendant again appealed to the Supreme Court of California, which denied the petition for review without prejudice. *People v. Barba*, No. S 181388, 2010 Cal. LEXIS 4428 (Cal. May 12, 2010). The defendant then petitioned for writ of certiorari to the United States Supreme Court, which granted the petition, vacated the judgment, and remanded the case to the California Court of Appeal for the Second Circuit in light of *Bullcoming*. *Barba v. California*, —— U.S. ——, 131 S.Ct. 3088, 180 L.Ed.2d 911 (2011). In *State v. Dilboy*, 160 N.H. 135, 999 A.2d 1092, 1104 (2010), the Supreme Court of New Hampshire held that the Confrontation Clause was not violated when an expert reviewed the test results of other analysts and testified as to the findings of those tests. The United States Supreme Court subsequently vacated and remanded for further consideration in light of *Bullcoming*. *Dilboy v. New Hampshire*, —— U.S. ——, 131 S.Ct. 3089, 180 L.Ed.2d 911 (2011).

sense was "testifying in the place of Dr. Donovan." At the same time, Dr. Baechtel testified that the opinions he was testifying to were his own. He explained that all FBI DNA reports are subjected to two levels of review before being issued. In the first or more intensive review, the original examiner's report is given to a second examiner who "sit[s] down with that information and go[es] through it as if it was his or her own case." That was Dr. Baechtel's role here. He took "the case . . . as having been given to [him]" without regard to "what the actual examiner [had] decided." He went "through it as if it's my case . . . and [came] to [his own] conclusions and . . . interpretation," only then comparing them to the first examiner's interpretation. After this "technical" or "peer review" was complete, he transmitted the report, which he signed only because he agreed with its conclusions, to the unit chief for a final "administrative review."

*Id.* Despite the government's contention that Dr. Baechtel formed his own independent conclusion, the court held that "[o]ur review of the record confirms that, at least in part, Dr. Baechtel's opinion that appellant could not be excluded as a contributor to the DNA evidence rested on the conclusions reached by the team that did the actual laboratory analysis and set forth those conclusions in the report he reviewed." *Roberts,* 916 A.2d at 938. Further, the court explained that there is "no room for dispute that the conclusions of FBI laboratory scientists . . . [that were] admitted as substantive evidence at trial are 'testimonial' under *Crawford* . . . ." *Id.*

This holding was affirmed in *Gardner,* in which the District of Columbia Court of Appeals stated, "In light of the fact that the conclusions of FBI laboratory scientists have been indisputably held to be 'testimonial,' the *Roberts* court concluded that the appellant's Sixth Amendment Confrontation rights could have been satisfied only by cross-examination of those scientists who actually conducted the testing." *Gardner,* 999 A.2d at 61. The court also emphasized that, just as in *Roberts* and *Veney,* the "experts [in *Gardner* ] quoted and directly referred to the conclusions of the lab analysts" and further

that the experts "repeatedly read from and directly referenced the testing results and conclusions of the analysts who conducted [the] test." *Gardner*, 999 A.2d at 61, 61 n. 12. Importantly, in addressing whether Fed.R.Evid. 703[13] survived *Crawford*, the court stated, "[T]hat determination does not help the government in this case, where the experts did not simply rely upon inadmissible hearsay in forming their expert opinions. Rather, here, the experts repeatedly directly referred to the inadmissible hearsay evidence and thus used it to prove the 'truth of the matter asserted.'" *Gardner*, 999 A.2d at 60 n. 11 (citation omitted).[14] In *Veney*, "the trial court

---

**13.** Fed.R.Evid. 703 states:
  The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.
  The Maryland analog to Fed.R.Evid. 703 is Md. Rule 5–703, which was derived from Fed.R.Evid. 703.

**14.** Regarding Fed.R.Evid. 703, we are informed by the work of Professor Richard D. Friedman, who has researched and written extensively about the Confrontation Clause, in addition to authoring and contributing to textbooks and treatises on evidence in general, and who has argued two Confrontation Clause cases before the Supreme Court. We are persuaded by his explanation in his blog, "The Confrontation Blog," regarding whether the testimonial reports must be formally admitted in order to trigger the Confrontation Clause. He recently explained:
  Formal admission of an out-of-court statement is not necessary to invoke the Confrontation Clause.... It should be enough if the prosecution is effectively asking the jury to infer that the in-court witness is communicating some or all of the substance of an out-of-court testimonial statement, and that this substance is true.
  Professor Richard D. Friedman, *Initial thoughts on Williams*, The Confrontation Blog (July 9, 2011, 2:26 AM), http://confrontationright. blogspot.com/. In applying this principle to a pending United States Supreme Court case, Friedman continued:
  In considering application of this principle to [*People v. Williams*, 238 Ill.2d 125, 345 Ill.Dec. 425, 939 N.E.2d 268 (2010), *cert. granted*, *Williams v. Illinois*, —— U.S. ——, 131 S.Ct. 3090, 180 L.Ed.2d 911 (2011)], note first that the existence of the statement was made clear

admitted Dr. Luttman's testimony, which was based on FBI laboratory reports, while neither the serologist who tested the items for blood and semen, nor the PCR/STR technician who extracted and amplified the samples from these items, testified at trial." *Veney*, 936 A.2d at 831. The government emphasized that "Dr. Luttman was the supervisory analyst, she was the only member of the three-person DNA team in this case who interpreted the DNA test results, and the only one who prepared a report based on those results," and further that "Dr. Luttman based her interpretation of the DNA profiles on her reading of a computer-generated graph, called an electropherogram, that was produced by the PCR/STR machine." *Id.* The court concluded:

> Dr. Luttman made references to the serology tests and the data produced by operation of a DNA-typing instrument, both carried out by other scientists on the team that she managed, which indicated that the DNA in semen stains found on S.P.'s clothing matched appellant's DNA. These test results, therefore, arguably were offered as substantive evidence.

---

to the jury. In other words, this is not a case in which an expert assembles information from one or more sources and then draws an inference based on that information without disclosing what it is or what its sources are.... Furthermore, it was clear what the substance of the statement was: It indicated that the vaginal swab taken from the crime scene reflected the same DNA profile as the swab taken from [Williams]. It is as if an in-court witness reports, "Somebody at the scene described the person she saw commit the crime, and the description closely matched Williams." So far as the Confrontation Clause is concerned, the report was presented to the jury. *Id.* In this way, it is clear that a DNA profile is submitted for its truth, and therefore cannot be considered as mere support on which "an expert bases an opinion or inference" under Md. Rule 5–703, but rather, must be considered a testimonial statement that is admitted as evidence of the truth of the matter asserted. This is because of the simple point that if a statement supports the expert's opinion only if it is true then it is a sham to say that it is being presented to support the opinion but not for its truth; ... the application of this principle is perfectly clear: If the profile revealed by the vaginal swab was not what the ... report said it was, then that report provided no support whatsoever for the expert's opinion. *Id.*

*Id.*[15]

In evaluating a Confrontation Clause claim of this sort, involving surrogate testimony and scientific testing, we must address the continued validity and application of Md. Rule 5–703. We shall hold that, because of the Confrontation Clause, an expert may not render as true the testimonial statements or opinions of others through his or her testimony. Although the Rule allows for an expert to base his or her opinion on inadmissible evidence, to the extent that Md. Rule 5–703 offends the Confrontation Clause, such testimony will not be admissible. As the United States Supreme Court stated in *Crawford,* "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' " *Crawford,* 541 U.S. at 61, 124 S.Ct. at 1370, 158 L.Ed.2d at 199. Specifically, if the inadmissible evidence sought to be introduced is comprised of the conclusions of other analysts, then the Confrontation Clause prohibits the admission of such testimonial statements through the testimony of an expert who did not observe or participate in the testing. Conversely, if the evidence relied upon by an expert in his or her testimony assembles nontestimonial information from one or more sources, and then draws a conclusion based on that information, then the expert is not merely serving as a surrogate to convey the conclusions of other analysts, but rather, is forming

---

**15.** The court in *Veney* held that although Dr. Luttman testified as to the test results produced by other analysts, the appellant could not prove plain error and therefore the violation did not result in reversal. *Veney,* 936 A.2d at 831–32. *Veney* also held that Dr. Luttman "used her own interpretations of the DNA evidence in arriving at the conclusion—that appellant could not be excluded as a contributor to the DNA evidence— to which she testified at trial." *Veney,* 936 A.2d at 831. We highlight this case to show the court's interpretation of the evidence under Fed.R.Evid. 703, and we note that the case was decided prior to the United States Supreme Court's determination in *Bullcoming* that the actual testing procedures, in addition to the results, constitute testimonial evidence against the accused. Thus, in light of *Bullcoming,* we do not believe the United States Supreme Court would accept *Veney's* determination that Dr. Luttman testified as to her own conclusions.

and testifying as to the expert's own independent opinion. In such a case, Md. Rule 5–703, as applied, would not appear to offend the Confrontation Clause.

■ The key distinction in this type of case is whether the testifying expert relies on raw data in forming his or her conclusions, as opposed to relying on the conclusions and opinions of others when testifying. As the United States Supreme Court made clear in *Bullcoming*, a certification is more than "machine-produced data," and instead constitutes representations "relating to past events and human actions." *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2714, 180 L.Ed.2d at 621. This is important because the testifying witness must be able to convey "what [the analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed," which cannot be achieved through surrogate testimony. *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2715, 180 L.Ed.2d at 622. Further, "surrogate testimony [cannot] expose any lapses or lies on the certifying analyst's part." *Id; see also Melendez*, 557 U.S. at ——, 129 S.Ct. at 2537, 174 L.Ed.2d at 326 (stating that "[c]onfrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well").

Based on this explanation, we view the term "raw data" in the context of a Md. Rule 5–703 inquiry to be limited to the data or materials which have not yet been subjected to scientific testing. Therefore, we hold, in accordance with *Bullcoming*, that the testimonial statement of the analyst is comprised of more than just the results of the testing. Instead, the testimony includes the underlying procedure or process because the "methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination." *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2537, 174 L.Ed.2d at 327. Accordingly, we agree with the District of Columbia Court of Appeals that, although Dr. Luttman used the data to inform her testimony, the data itself was both substantive and testimonial evidence, and therefore the analysts who actually performed the testing were also

required to testify in order to satisfy Derr's right to confrontation.[16]

Turning specifically to the case *sub judice*, there are three pieces of evidence and related testimony that implicate the Confrontation Clause: (1) the serological report from 1985 in which the biologist identified sperm and semen on genital and vaginal swabs taken from the victim; (2) a DNA profile generated in 2002 by Dr. Donovan when the sample was submitted to the FBI for DNA testing, which provided a match between the profile generated from the sample taken from the victim at the time of the crime and Derr's DNA profile stored in CODIS; and (3) a DNA profile created from a new sample of Derr's DNA in 2004. Similar to the prosecution in *Bullcoming*, the State in this case employed surrogate testimony, calling "another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test[s]" to testify as to the forensic examinations and results, providing evidence to establish Derr's guilt. This scientific evidence was presented through the testimony of Dr. Jennifer Luttman, an FBI forensic examiner who supervised the laboratory work of biologists on her "team." Dr. Luttman took no part in the 1985 serological testing or the 2002 DNA testing. She did not perform the actual bench work with regard to the 2004 test, nor is there any indication that she actually observed the biologists per-

---

**16.** The concurring opinion in *Bullcoming* noted that the majority opinion in that case did not address whether, under Fed.R.Evid. 703, a testifying analyst could rely on the report of a nontestifying analyst in forming his or her own independent opinion, so long as the actual report containing the testimonial statements of the nontestifying analyst was not itself admitted. *See Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2722, 180 L.Ed.2d at 629 (Sotomayor, J., concurring in part). We note, however, that the case before us is not such a case because, like in *Bullcoming*, the reports of the nontestifying analysts were admitted into evidence and their substance was admitted through the testimony of Dr. Luttman. In the present case, Dr. Luttman relied entirely on the testimonial statements of others in forming her conclusions. The serology report and DNA profiles were admitted into evidence, through Dr. Luttman, for their substance, and the Confrontation Clause was therefore violated because the documents contained testimonial statements of nontestifying witnesses.

form the test, notwithstanding the fact that the test was conducted by her team and she reviewed the results. Dr. Luttman therefore acted as a surrogate for the analysts who actually performed the tests, thereby creating a Confrontation issue because the testimonial witnesses involved in the process were not available for cross-examination.

Derr argues that he was denied "the opportunity to confront and cross-examine the analysts who performed the scientific testing of the biological evidence that was the foundation for the DNA 'match' evidence[.]" He continues that "testimonial statements (the opinion of the serology examiner, and the DNA test results) of witnesses (the serology examiner and the DNA analyst) who did not appear at trial were introduced against Mr. Derr" and therefore "[t]he admission of these testimonial statements violated Mr. Derr's Confrontation Clause right...." Derr maintains that the testing is a "highly analytical and complex scientific test that involved the exercise of judgment and interpretation in anticipation of a criminal prosecution." Derr argues that by not allowing him to confront the analysts, "the jury was [led] to believe that the match itself established the reliability of the underlying serological examination and DNA analysis...."

In addition, Derr asserts that Dr. Luttman's "forensic testimony served the dual purpose of providing the *sole* identification evidence of appellant Norman Derr as the perpetrator of a rape and sexual assault, while simultaneously shielding the forensic testing from any effective cross-examination." Further, Derr claims that the State never "explains precisely *how* Mr. Derr—or any other criminal defendant confronted with scientific evidence—could meaningfully challenge the actual conduct of the forensic testing, when the results of the testing (whether in the form of opinions or 'raw' data) are introduced into evidence through surrogate forensic testimony." Relying on *Melendez*, Derr asserts that "[a]llowing expert witnesses ... to testify about forensic tests performed by third party analysts strips defendants of the opportunity to probe the analyst's 'honesty, proficiency, and methodology,' thus making it impossible to 'weed out' fraudulent analysts as well as

incompetent ones . . . . " Derr concludes that "[t]he opinion of the serologist, and the DNA test results, are testimonial under *Crawford* because they were made under circumstances that would lead an objective analyst reasonably to believe the statements would be available for use at a later trial" and further that "[t]he information about the perpetrator's DNA profile conveys in a graphic form precisely what the analyst would be expected to testify about on direct examination at trial."

The State bases much of its argument on Md. Rule 5–703, maintaining that the DNA results were not testimonial. The State characterizes the DNA results as "raw data" and states that the data was not introduced for the truth of the matter asserted, but rather, as the basis of Dr. Luttman's opinion, and therefore the data is not hearsay. The State also argues that data is not testimonial hearsay because it is not a statement made by a person. The State then argues that even if the information is hearsay, it is not testimonial under *Crawford,* because it "is not an affidavit, a certified record, a deposition, or anything else intended to be a 'weaker substitute for trial testimony.' " The State concludes that "experts are entitled to base opinions on data generated by others," and maintains that Dr. Luttman delivered her own opinions and conclusions in her testimony.

We shall hold that the trial judge erred in admitting the 1985 serological test, and the 2002 and 2004 DNA test results because the reports were testimonial statements and their admission through the testimony of Dr. Luttman violated Derr's right under the Confrontation Clause. Specifically, we address the results of the 1985 serological test. Dr. Luttman testified regarding the opinion and conclusion of the serologist that semen and sperm were present on the swabs. Dr. Luttman testified that a serology examiner at the FBI in 1985 performed the test by viewing the sample under a microscope and concluding that the cells he viewed were sperm cells. The actual test and the procedures used are unknown. Dr. Luttman knew only that the serological examiner was an FBI

agent named "Babiak"; she did not know whether Babiak did the bench work (*i.e.*, the testing, calculations, and reporting), what his credentials were, how long he worked at the FBI, his proficiency ratings, or any other information regarding who actually performed the bench work. Dr. Luttman knew only that Babiak interpreted the results of testing performed by a biologist, who analyzed the serology sample. Someone wrote a report analyzing the serology sample and an agent named Babiak signed that report. Specifically, the following exchange took place during a bench conference regarding the admissibility of the 1985 serology evidence:

Defense Attorney: [The report] contains his [*i.e.*, the serologist's] conclusions with regard to his interpretations of the tests, right?

Luttman: Those notes contain the biologists's [sic] results and then the examiner took those results and drew their conclusions, just like I do today.

Defense Attorney: All right. But I thought you said you didn't know if Babiak [the serologist] was a biologist.

Luttman: No. Babiak was a forensic examiner, forensic serology examiner.

Defense Attorney: Okay. So who was the biologist then?

Luttman: I do not know who the biologist was.

Defense Attorney: So there's actually more than one person involved in this process then?

Luttman: Yes. Just like it's current practice now. There was a biologist and an examiner who did the work. And I do no[t] know in 1985 who the biologist was.

Defense Attorney: And at that time in '85 were lab examiners special agents?

Luttman: Yes they were. Babiak was a special agent.

Defense Attorney: So he was actually a sworn law enforcement official, right?

Luttman: That's correct.

Defense Attorney: And I guess it's pretty obvious that he knew he was examining a sex crime kit, right?

Luttman: That's correct. He did not do the actual bench work a biologist did, but he knew.

Defense Attorney: So he was, the FBI officer was doing the interpretation of whatever bench work was done?

Luttman: Right.

The State then asked Dr. Luttman about notations on the report that was admitted into evidence. Dr. Luttman said, "They were by the person who did the bench work. And then the report was written by Babiak, that has the conclusions."

Finally, in her testimony Dr. Luttman relied on the serological examiner's conclusion that sperm cells were present, and she stated that it is the "FBI's policy not to repeat tests where . . . we have reports from laboratory results." Ultimately, Dr. Luttman conceded that she could not form an independent basis for her conclusions without trusting the report.[17] Accordingly, it is clear that Dr. Luttman did not testify as to her own independent conclusions, but rather, relied on the conclusions of Babiak, which in turn were based on the lab work of an unknown biologist. Furthermore, those conclusions were clearly prepared for possible later use at trial because the serologist was a sworn law enforcement officer engaging in a criminal investigation.[18] Therefore, the findings contained in

---

**17.** The dissent expresses a concern that if forensic testing such as the 1985 serology analysis and the 2004 DNA profile are subjected to the Court's holding in *Bullcoming*, cold cases will be nearly impossible to prosecute without calling the specific analyst who performed the test to appear in court. The Court in *Bullcoming*, however, presented a solution to this problem, positing that "New Mexico could have avoided any Confrontation Clause problem by asking Razatos to retest the sample, and then testify to the results of his retest rather than to the results of a test he did not conduct or observe." *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2718, 180 L.Ed.2d at 624. Thus, by preserving the physical evidence in a laboratory and having it retested by another analyst, the new analyst may testify in court as to his or her independent findings from the retest. The testimony by the new analyst, who actually performed or observed the retest, could satisfy the requirements of the Confrontation Clause.

**18.** *Melendez* clarified and *Bullcoming* affirmed, a point the dissent overlooks, that "[a] document created solely for an 'evidentiary purpose,'" and "made in aid of a police investigation, ranks as testimoni-

the serological report indicating the presence of sperm and semen are testimonial because the report contains a solemn declaration of fact, reflecting the functional equivalent of in-court testimony, and the report was prepared for later use at trial. *See Melendez,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 321; *see also Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2712, 180 L.Ed.2d at 619. Therefore, the trial court erred in admitting the serology report and Dr. Luttman's testimony regarding the report.

■■■ As to the DNA profile created in 2002, the trial judge erred in concluding that, although Dr. Donovan's report was testimonial, the underlying data was not. The DNA profile was based on the test performed by Dr. Donovan, an FBI examiner who did not testify at trial, and it provided the basis for the match between the unknown sample and the profile in the CODIS database. Dr. Luttman testified as to the methodology used and the results obtained from the 2002 test, and she also testified that neither she nor her team were involved in the testing. When asked whether she was involved in the 2002 test, Dr. Luttman responded, "No. But I interpreted those tests that were done in 2002." When asked to clarify, she then stated, "I do not do any of the bench work tests, whether it was in 2002, 2004 or 2006. I interpret the results." Clearly, Dr. Luttman relied on the report authored by Dr. Donovan as the basis for her testimony. Dr. Luttman revealed that once the sample was submitted for testing, "the

al." *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2717, 180 L.Ed.2d at 623 (quoting *Melendez,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 321). The Supreme Court went further to point out in *Bullcoming* that "[a]s the New Mexico Supreme Court recognized, 'the absence of [an] oath [i]s not dispositive' in determining if a statement is testimonial." *Id.* (quoting *Crawford,* 541 U.S. at 52, 124 S.Ct. at 1364, 158 L.Ed.2d at 193). Thus, the conclusion by the FBI analyst, as reflected in the 1985 serology report and as introduced into evidence, that semen and sperm were present in the biological evidence tested, clearly "[fell] within the core class of testimonial statements," whether that assertion was sworn or unsworn. *See Melendez,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 321; *see also Davis,* 547 U.S. at 822, 126 S.Ct. at 2273, 165 L.Ed.2d at 236–37; *Crawford,* 541 U.S. at 51–52, 124 S.Ct. at 1364, 158 L.Ed.2d at 192–93.

biologist who did that documented the day she did it, the steps she took to do that and then a portion of that sample was then further characterized through DNA typing." Dr. Luttman also described the roles of the various analysts who were involved, stating that "the extraction of the DNA started May 31, 2002 and then the DNA for the biologist was finished I think it was June 17, 2002. And then the examiner did the interpretation in September of 2002," thus explaining that multiple parties were involved in the testing process, none of whom were Dr. Luttman. Despite her lack of involvement, Dr. Luttman testified on direct examination: "My opinion is that specimen K10, which is Norman Derr, is the source of the DNA found on specimens Q 15 and Q 16 [from the PERK kit] to a reasonable degree of scientific certainty."

Derr argues that "[t]he DNA test results, although computer-generated in their final form, were the end product of a highly analytical process that required the analyst to exercise judgment and interpretation," and were therefore testimonial statements of the analyst. Derr continues that the "test results, although computer generated during the final stage of the DNA analysis, were produced with the assistance and input of the analyst and must, therefore, be attributed to the analyst." Finally, Derr contends that "[a] DNA analyst must follow a detailed protocol that requires the exercise of judgment and discretion at each stage of the process," and therefore "the results cannot be attributed solely to a machine." We agree. As stated by the United States Supreme Court in *Melendez*, whatever testimony is introduced must be live. *Melendez*, 557 U.S. at ——, 129 S.Ct. at 2532 n. 1, 174 L.Ed.2d at 322 n. 1. The prosecution does not have discretion in determining who may testify regarding testimonial statements at issue; its discretion lies in deciding which testimonial statements it chooses to admit. While Dr. Luttman had a "general knowledge" of the procedures employed in the lab, she did not have first-hand knowledge of the actual procedures performed in this case, and thus she could not be cross-examined regarding Dr. Donovan's statements without violating the Confrontation Clause. The DNA test results and the

report were therefore not admissible without Dr. Donovan's testimony. As stated in *Bullcoming*, "the analysts who write reports that the prosecution introduces must be made available for confrontation," and therefore the admission into evidence of the 2002 DNA analysis and DNA profile through the surrogate testimony of Dr. Luttman violated the Confrontation Clause. *Bullcoming*, ⸺ U.S. at ⸺, 131 S.Ct. at 2715, 180 L.Ed.2d at 621. Hence, it was improper to receive into evidence Dr. Luttman's testimony regarding Derr's DNA profile created in 2002, merely because she was a supervisor and had been designated by the court as an expert in the field of DNA analysis. As stated in *Bullcoming*, "surrogate testimony of the kind [the supervisor] was equipped to give could not convey what [the analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed." *Bullcoming*, ⸺ U.S. at ⸺, 131 S.Ct. at 2715, 180 L.Ed.2d at 622.

Finally, with regard to the 2004 test, the record regarding the full extent of Dr. Luttman's involvement in developing the DNA profile is unclear. In *Bullcoming*, the Court opined that the in-court testimony of a scientist who performed tests or who observed tests being performed could satisfy the constitutional requirements of the Confrontation Clause. *Bullcoming*, ⸺ U.S. at ⸺, 131 S.Ct. at 2709–10, 180 L.Ed.2d at 616. Although the Court did not go so far as to define the extent of observation necessary to satisfy the Confrontation Clause, it is indisputable that some level of actual observation of the testing would be necessary to safeguard the principles underlying this constitutional right.

Dr. Luttman indicated that she supervised the team of biologists who conducted all of the bench work and, according to her testimony, the supervisor evaluates the analyst's results before formulating the report. Dr. Luttman reiterated several times throughout her testimony that she did not perform any of the actual testing in the 2004 analysis. In addition, it is not clear whether she was present and observed the actual procedures. Nowhere in Dr. Luttman's testimony did she indicate that she was physically present to observe the biolo-

gists conduct the relevant tests. In fact, when asked whether she "might be at a conference or testifying and [her] team is back at the lab doing the bench work," Dr. Luttman responded, "Yes they are." Dr. Luttman's consistent description of her involvement with the 2004 analysis was that she reviewed the results of the bench work performed by the biologists. Therefore, on the basis of the record before us, we cannot say that Dr. Luttman observed the 2004 testing being performed. Because our disposition of this case is to reverse and to remand to the Circuit Court for further proceedings, further probing of Dr. Luttman's involvement in the 2004 testing procedures can be done at that time. Consistent with the Supreme Court's holding in *Bullcoming*, if on remand to the Circuit Court evidence is presented by the State indicating that Dr. Luttman did in fact observe the 2004 testing, the requirements of the Confrontation Clause, indeed, may be satisfied, and the 2004 DNA analysis may be properly admissible through surrogate testimony.

Accordingly, we shall reverse the judgment of the Circuit Court for Charles County and hold that the trial judge erred in admitting the results of scientific testing through a surrogate analyst who did not, on the basis of this record, perform or observe the actual testing.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR PURPOSES OF A NEW TRIAL. COSTS IN THIS COURT TO BE PAID BY CHARLES COUNTY.**

HARRELL and BATTAGLIA, JJ., Concur and Dissent.

HARRELL, J., concurring and dissenting, in which BATTAGLIA, J., joins.

Recent United States Supreme Court jurisprudence reconfigures the contours of the admissibility of evidence and testimony for purposes of the Confrontation Clause; however, the Court's holdings in that regard are highly fact-bound and therefore make difficult extrapolating a broad rule of law to be

applied prospectively. *See generally Bullcoming v. New Mexico,* ⸺ U.S. ⸺, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011); *Melendez–Diaz v. Massachusetts,* 557 U.S. ⸺, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009); *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Although the Majority opinion here accepts wholly these cases as controlling in the present case, the Majority ignores, to my thinking, several critical factual distinctions between the present case and the latest Supreme Court decisions. I believe these distinctions render the 1985 and 2004 scientific reports (and Dr. Luttman's testimony regarding these reports) admissible, because these reports are distinguishable from the specific facts with which the Supreme Court dealt in *Bullcoming* and *Melendez–Diaz.*[1]

---

1. In a concurring opinion in *Bullcoming v. New Mexico,* ⸺ U.S. ⸺, ⸺, 131 S.Ct. 2705, 2719, 180 L.Ed.2d 610, 626 (2011), Justice Sotomayor stated that the central issue with the report in question (there, a forensic laboratory report relating to Bullcoming's blood alcohol concentration) was whether "its 'primary purpose' is evidentiary." She further emphasized the limited nature of the Majority opinion's holding, presenting several factual situations that may allow a court to admit testimony and/or evidence through a surrogate witness, which are of particular relevance in the present case:

> First, this is not a case in which the State suggested an alternate purpose, much less an alternate *primary* purpose. For example, the State has not claimed that the report was necessary to provide Bullcoming with medical treatment.
> Second, this is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue.
>
>   \*  \*  \*
>
> Third, this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence.
>
>   \*  \*  \*
>
> Finally, this is not a case in which the State introduced only machine-generated results, such as a printout from a gas chromatograph.

*Bullcoming,* ⸺ U.S. at ⸺, 131 S.Ct. at 2722, 180 L.Ed.2d at 628–29 (internal citations omitted). Although the Majority opinion in *Bullcoming* did not discuss expressly these factual situations, and Justice Sotomayor declined to elaborate on the strength of these specific arguments for admissibility, the limited nature of the holding in *Bullcoming* allows for at least the possibility of the admission of both Dr. Luttman's

Working within the confines of these cases (and subsequent cases applying their holdings), I would hold that, on this record extract, Dr. Luttman's testimony regarding the 1985 serological test and the 2004 DNA test (and the reports themselves), are admissible, as they do not frustrate Derr's confrontation rights. I agree with the Majority, however, that Dr. Luttman's testimony regarding the 2002 test is inadmissible in light of the Supreme Court's decision in *Bullcoming*. That is, because I agree that the 2002 test is "a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification," [2] *Bullcoming*, —— U.S. at ——, 131 S.Ct. at 2710, 180 L.Ed.2d at 616, I believe the Majority opinion is correct to hold that the admission of testimony regarding the 2002 test was reversible error.

## I. *1985 Serology Report*

In 1984, when hospital personnel collected evidence using a physical evidence recovery kit ("PERK") on Alida Cook (now Berman), and the FBI conducted tests on the physical evidence, DNA testing—prolific today—was not a standard procedure utilized in the course of rape investigations. The FBI personnel (a biologist and a forensic serological examiner), therefore, did not conduct DNA testing on the physical evi-

---

testimony regarding the 1985 and 2004 reports and the reports themselves in the present case. As discussed in further detail *infra*, Dr. Luttman had a personal connection to the 2004 testing through her role as a supervisor, gave her expert opinion about "underlying testimonial reports" that were not necessarily admissible (i.e., the 2002 report) and interpreted and compared the raw data from the 1985 report.

**2.** Unfortunately, the direction the Supreme Court has taken seems to inhibit significantly the Government's ability to prosecute "cold cases" similar to the present case. If the Supreme Court extends further the holding in *Bullcoming,* to include under the now vast umbrella of "testimonial hearsay," tests similar to the 1985 serology and the 2004 DNA sampling, it may become next to impossible to prosecute "cold cases" without every FBI or private crime lab analyst or technician appearing in court.

dence; rather, the serological test performed in 1985 identified merely the existence of sperm and semen in the swabs collected from the PERK.

## A. *Hearsay*

Before this Court engages in a Confrontation Clause analysis, "the first question is whether the rules of evidence, including but not limited to the hearsay rule, exclude it." LYNN MCLAIN, MARYLAND PRACTICE, MARYLAND RULES OF EVIDENCE 189 (3d ed.2007). Not until we determine that the evidence or testimony is admissible under our evidentiary rules do we reach the separate question of whether the Confrontation Clause excludes such evidence and/or testimony. *See id.* The State entered into evidence the 1985 test, conducted by FBI analysts and biologists, to explain the conclusion that Dr. Luttman attested to; namely, that the sample from the 1984 PERK matched a DNA sample obtained from Derr in 2004. Maryland Rule 5–801 defines hearsay as, "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*"[3] (Emphasis added.) I would hold that, in the present case, the State presented underlying facts and raw data (i.e., the report), which Dr. Luttman used to support her conclusions, "not for the truth of the matter asserted, but for the purpose of explaining the basis for h[er] opinion." *People v. Williams,* 238 Ill.2d 125, 345 Ill.Dec. 425, 939 N.E.2d 268, 278 (2010); *see also State v. Gietzen,* 786 N.W.2d 1, 7 (N.D.2010) ("[The data] lays foundation for the admission of [the defendant's] chemical analysis but it does not directly prove an element of the charged crime.").

If a court determines that evidence or testimony is hearsay, it is inadmissible and, therefore, the Confrontation Clause is not implicated in the first instance. In *State v. Snelling,* 225

---

**3.** The definition of hearsay in Maryland Rule 5–801 and the language in Maryland Rule 5–703 (quoted later) is analogous materially to that of other state and federal rules discussed *infra.*

Ariz. 182, 236 P.3d 409, 414 (2010)—a post-*Melendez–Diaz* case—the Arizona Supreme Court found that the testimony of a medical examiner was not hearsay, and thus, the admission of the testimony did not violate Snelling's confrontation rights. Although the appellate court recognized that the medical examiner relied on an autopsy report that she did not conduct or observe, the court determined that she was not a "conduit" merely for the admission of otherwise inadmissible hearsay evidence because she also studied crime scene photographs and used her own training to come to an independent conclusion. *See id.* Similarly, I would hold that an expert witness, relying reasonably on facts and underlying data in order to show the basis of his or her opinion, is not testifying to "prove the truth of the matter asserted by an out-of-court declarant" and the testimony is not hearsay.

The Supreme Court of Illinois, in *Williams, supra,*[4] discussed a situation similar to *Snelling* and the present case. At trial, the court allowed the prosecution's expert witness to testify concerning a DNA report, which she did not prepare. *See Williams,* 345 Ill.Dec. 425, 939 N.E.2d at 277. Williams argued that the report was introduced to establish the truth of the matter asserted—that Williams's DNA matched the DNA profile created using physical evidence collected from a rape kit. *See Williams,* 345 Ill.Dec. 425, 939 N.E.2d at 270, 278. The prosecution argued that the report was used only to explain how the expert formed her opinion and that her opinion alone was the only statement offered for the truth of

---

**4.** The Supreme Court granted recently certiorari in *People v. Williams,* 238 Ill.2d 125, 345 Ill.Dec. 425, 939 N.E.2d 268 (2010), *cert. granted,* —— U.S. ——, 131 S.Ct. 3090, 180 L.Ed.2d 911 (2011). The question presented "indicates that the expert opinion issue posed in Justice Sotomayor's concurrence [in *Bullcoming* ] is likely to be addressed by the Court [in *Williams* ]:"

> Whether a state rule of evidence allowing an expert witness to testify about the results of DNA testing performed by non-testifying analysts, where the defendant has no opportunity to confront the actual analysts, violates the confrontation clause.

*State v. Roach,* 2011 WL 3241467, 2011 N.J.Super. Unpub. LEXIS 2071 (App.Div. 1 August 2011).

the matter asserted. *See Williams*, 345 Ill.Dec. 425, 939 N.E.2d at 278.

The *Williams* Court explained that expert witness testimony regarding underlying facts and data, which may be otherwise inadmissible, is not considered hearsay when done for the purpose of explaining his or her opinion.[5] *See Williams*, 345 Ill.Dec. 425, 939 N.E.2d at 278; *Snelling*, 236 P.3d at 414; *see also Rollins v. State*, 392 Md. 455, 499, 897 A.2d 821 (2006). The appellate court held that the expert was not a "conduit" merely for regurgitating the exact words of the report, because the expert "made her own visual and interpretive comparisons ... to make a conclusion on the critical issue: that there was a match to the defendant's profile." [6] *Williams*, 345

---

**5.** Maryland Rule 5–703 provides:

(a) **In General.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

\* \* \*

(c) **Right to Challenge Expert.** This Rule does not limit the right of an opposing party to cross-examine an expert witness or to test the basis of the expert's opinion or inference.

As we explained in *Rollins v. State*, 392 Md. 455, 505, 897 A.2d 821, 850 (2006), this rule is a well-settled, back-door hearsay exception: "Federal courts and a majority of state courts permit an expert witness to express an opinion that is based, in part, on hearsay of a kind customarily relied on.... This rule has been long accepted in Maryland." (Internal citations and quotation marks omitted.). While "the proffered evidence [may not] meet the definition of hearsay, it [may] be admitted 'for the limited purpose of explaining the basis for the expert's opinion.' " *Id.* (internal citations omitted).

Although *Rollins* is a pre–*Melendez–Diaz* case, both state and federal courts have applied their evidence rules analogous to Md. Rule 5–703 in the post–*Melendez–Diaz* landscape. *See, e.g., Morris v. United States*, 2010 WL 1752030, at \*3, 2010 U.S. Dist. LEXIS 53583, at \*9 (D.S.D. 29 April 2010) (*"Melendez–Diaz* did not dispose of Federal Rule of Evidence 703."); *People v. Johnson*, 406 Ill.App.3d 114, 346 Ill.Dec. 264, 940 N.E.2d 264 (2010) (that *Melendez–Diaz* does not abrogate Illinois Rule 703).

**6.** In *United States v. Blazier*, 69 M.J. 218, 222 (C.A.A.F.2010), the Court of Appeals for the Armed Forces held—in the context of an expert witness who did not conduct a test, but testified as to the results of the

Ill.Dec. 425, 939 N.E.2d at 280. Further, the court noted that, as the testimony in question did not constitute hearsay, "the trial court and appellate court properly concluded that *Crawford* [i.e., Confrontation Clause] considerations did not apply here." *Williams*, 345 Ill.Dec. 425, 939 N.E.2d at 282.

*Williams* and *Snelling*, therefore, stand for the proposition that, as long as expert witnesses interpret, compare, or otherwise draw their own conclusions regarding tests completed by other analysts (as was the case with the 1984 serology test in the present case) the testimony regarding the test and the test itself are not hearsay and thus, *ipso facto*, its admission does

test and his own interpretation of those results—that an expert is permitted to rely on, repeat, or interpret non-hearsay data and/or rely on, but not repeat hearsay that is a basis for his or her opinion, as long as the expert forms his or her independent opinion. In *Blazier*, the prosecution attempted to enter into evidence two drug testing reports signed by two different individuals; the prosecution's expert witness was the "Laboratory Certifying Official," and testified as to the accuracy of the reports. *See Blazier*, 69 M.J. at 220.

In reaching its conclusion, that some, but not all, of the expert's testimony was admissible, the appellate court applied three established principles of the rules of evidence: (1) machine-generated data and printouts are not statements and thus are not hearsay (and, *ipso facto*, the data is not "testimonial"); (2) expert witnesses may rely on and review "work of others, including laboratory testing conducted by others, so long as they reach their own opinions in conformance with evidentiary rules regarding expert opinions"; and (3) expert witnesses are not permitted to "act as a conduit for repeating testimonial hearsay." *Blazier*, 69 M.J. at 224–25. Therefore, the federal appeals court concluded, the expert's testimony that explained and analyzed the documents was admissible because it was not hearsay; the expert's conclusions were his own, based on his training, education, and experience. *See Blazier*, 69 M.J. at 225–26. Portions of the expert's testimony, however, consisted of statements conveying exact language from the documents—i.e., what tests were conducted, what substances were identified, and what level of each substance was detected—such statements, the court held, were inadmissible hearsay. *See Blazier* 69 M.J. at 226.

As applied to the present case, Dr. Luttman relied on the work of the hospital personnel who collected the physical evidence and the FBI biologist and forensic serologist, and, based on her experiences as an FBI DNA analyst and supervisor, she came to the conclusion that the 1985 sample contained sperm and semen. Although this conclusion is the same as the conclusion that was in the report, Dr. Luttman was not acting as a "conduit for repeating testimonial hearsay."

not violate the Confrontation Clause. In other words, "the constitutional dividing line" should be drawn between "expert testimony that is merely a 'conduit' for someone else's analysis versus expert testimony in which the live witness offers their own independent analysis." *Williams*, 345 Ill.Dec. 425, 939 N.E.2d at 280. The evidence Dr. Luttman provided in court was her opinion, based on a comparison and interpretation of the reports, that the sample from 1984 matched the sample from 2004. *See Williams*, 345 Ill.Dec. 425, 939 N.E.2d at 279 ("The evidence against the defendant was [the expert's] opinion, not [the crime lab's] report ... [the expert] testified to her conclusion based upon her own subjective judgment about the comparison of the [crime lab] report with the existing ... profile."). The report conducted in 1985, therefore, should not be considered hearsay because it was a basis merely for Dr. Luttman's subjective opinion. Accordingly, I would hold that the 1985 report, being admissible non-hearsay, does not implicate the Confrontation Clause.

## B. *Confrontation Clause Implications*

In holding that Dr. Luttman's testimony regarding the 1985 serology report is inadmissible, the Majority states that the report is not "raw data," which includes only "data or materials which have not yet been subjected to scientific testing." *See* Maj. Op. at 244, 29 A.3d at 554. Even if the 1985 serology report and Dr. Luttman's testimony regarding the report are hearsay (a belief I do not harbor), I believe the 1985 serology report contains merely "raw data," and testimony relating to that report is not "testimonial" within the contemplation of the Confrontation Clause. I would hold, therefore, that both the report and Dr. Luttman's testimony regarding that report do not violate Derr's confrontation rights and were, therefore, admissible.

The Court of Appeals of New York held in *People v. Brown*, 13 N.Y.3d 332, 890 N.Y.S.2d 415, 918 N.E.2d 927, 931 (2009)—a post *Melendez–Diaz*, pre-*Bullcoming* case—that a laboratory testing report was not testimonial because "it consisted of merely machine-generated graphs, charts and numerical

data." In *Brown,* a young woman was raped allegedly in 1993; when she escaped her attacker, a friend brought her to a local hospital. *See Brown,* 890 N.Y.S.2d 415, 918 N.E.2d at 928. The hospital collected evidence using a rape kit, but, due to back-log in the system, DNA testing was not completed for almost nine years. *See id.* The laboratory that conducted the test isolated a male DNA specimen and produced a DNA report, which implicated Brown in the rape. *See Brown,* 890 N.Y.S.2d 415, 918 N.E.2d at 929. At trial, an expert witness testified to the findings in the DNA report, even though he did not participate directly in the testing procedure. *See Brown,* 890 N.Y.S.2d 415, 918 N.E.2d at 930. In holding that the DNA report constituted "raw data" alone, the New York court explained that such "raw data" could be introduced at trial properly, with accompanying live witness testimony, without running afoul of the Confrontation Clause.

The facts of *Brown* vary greatly from those with which the Supreme Court in *Melendez–Diaz* dealt. The prosecution in *Brown* called a live witness to attest to the findings in the original DNA test and the later match found in CODIS, *see Brown,* 890 N.Y.S.2d 415, 918 N.E.2d at 931, whereas, in *Melendez–Diaz,* the prosecution entered into evidence, without live testimony by a witness, "certificates of analysis" signed by law enforcement officials, which stated that a substance seized from the defendants was cocaine of a certain weight. *See Melendez–Diaz,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 314. The *Melendez–Diaz* Majority dismissed the prosecution's argument that, for Confrontation Clause purposes, the affidavits were "the result of neutral, scientific testing" because the affidavits "contained only the bare-bones statement that 'the substance was found to contain: Cocaine.'" *Melendez–Diaz,* 557 U.S. at ——, 129 S.Ct. at 2536–37, 174 L.Ed.2d at 326–27 (internal citations and alterations omitted). Moreover, the prosecution in *Melendez–Diaz* did not present a live witness to review or verify the results contained in the affidavits. *See Melendez–Diaz,* 557 U.S. at ——, 129 S.Ct. at 2536, 174 L.Ed.2d at 326 ("[The Confrontation Clause] commands, not that evidence be reliable, but that

reliability be assessed in a particular manner: by testing in the crucible of cross-examination.") (quoting *Crawford,* 541 U.S. at 61–62, 124 S.Ct. at 1354, 158 L.Ed.2d at 177). In contrast, in *Brown,* the laboratory's original DNA report contained no conclusions, interpretations, or comparisons; therefore, according to the appellate court, it was "raw data . . . in the form of nonidentifying graphical information." *Brown,* 890 N.Y.S.2d 415, 918 N.E.2d at 931 (internal citation and quotation marks omitted). The analyst herself testified that "she had personally examined the [laboratory] file; she interpreted the profile of data represented in the machine-generated graphs; and she made the critical determination linking the defendant to the crime;" she further testified that she was familiar with the laboratory's procedures and protocols. *Id.* As the data presented in *Brown* was merely "raw data" and the prosecution provided live witness testimony interpreting the report, the testimony was admissible. *Brown,* 890 N.Y.S.2d 415, 918 N.E.2d at 932. The facts of the present case, where Dr. Luttman testified in court regarding the 1985 serology report, which consisted of raw data merely, are closer to *Brown* than *Melendez–Diaz.*

*Bullcoming,* the Supreme Court's most recent Confrontation Clause gift,[7] was decided after *Brown,* and does not alter, in my view, the viability of the holding in *Brown.* In *Bullcoming,* which involved a forensic laboratory report certifying that Bullcoming's blood-alcohol concentration ("BAC") was above the threshold for purposes of a driving while intoxicated (DWI) charge, the Supreme Court held that the admission of surrogate testimony of a witness who did not "sign the certification or *perform or observe* the test reported in the certification" violates the Confrontation Clause. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2710, 180 L.Ed.2d at 616 (emphasis added). A witness for the prosecution testified regarding the

---

7. As the Supreme Court's decision in *Bullcoming* is very recent, very few lower courts have had the opportunity to apply the decision to a different set of facts. On 29 July 2011, the United States Court of Appeals for the District of Columbia Circuit interpreted *Bullcoming* in deciding *United States v. Moore,* 651 F.3d 30 (D.C.Cir.2011).

BAC report, which contained not only facts, but also subjective conclusions of the analyst. *See id.* Specifically, the report in question included: (1) the reason Bullcoming was stopped by police officers; (2) a certification by the nurse who drew the blood; (3) a "certificate of analyst"; (4) Bullcoming's blood alcohol level; (5) an affirmation that the sample was received intact; (6) a statement that the bulk of the report was correct; (7) a statement that the proper procedures were followed; and (8) a certificate of the reviewing analyst. *See id.* The report, therefore, was clearly not "raw data," but rather was a detailed description of "past events and human actions." *See id.* ("[T]he report was 'functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination.'" (quoting *Melendez–Diaz,* 557 U.S. at ——, 129 S.Ct. at 2532, 174 L.Ed.2d at 321)). Because the analyst who performed the test and wrote the report included conclusions in the report—that the test complied with standard procedures, and that the statement of the report was correct—the Supreme Court held that report was testimonial in nature and afforded Bullcoming no opportunity to confront the analyst in hopes of "expos[ing] any lapses or lies on the certifying analysts part," and the use of a surrogate witness who neither observed nor supervised the test did not cure that. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2722, 180 L.Ed.2d at 617.

Although the record extract is not clear as to what exact data the 1985 serology report included, Dr. Luttman's testimony and the serology report itself resembles closely the factual situation in *Brown,* and is distinguishable readily from the factual scenarios in *Melendez–Diaz* and *Bullcoming.* First, as in *Brown,* and unlike *Melendez–Diaz,* the State here did not provide merely a "bare-bones" statement without live testimony, instead the state called a witness, Dr. Luttman, to testify regarding her interpretation of the 1985 serology test. Second, similar to the expert in *Brown,* who testified regarding the accuracy of a DNA report based on her knowledge and expertise, Dr. Luttman testified that she reviewed personally the report and could state, "within a reasonable degree of

scientific certainty," that semen and sperm were present on the physical evidence obtained from the PERK because, in her experience, "[s]perm cells have a very distinct shape that's very different from other cells . . . when you see those cells on the microscope slide you know that there's semen present." Third, Dr. Luttman, an FBI DNA analyst, used her experience and knowledge, combined with findings of the later DNA reports, much like the witness in *Brown*, and determined that the physical evidence in the PERK was in fact semen and sperm and a match to Derr's DNA profile.[8] Finally, the report, unlike in *Bullcoming*, did not contain, on the present record, an affirmation or certification, by either the biologist or the forensic serology examiner, that the findings in the report were "correct." Because I believe *Melendez–Diaz* and *Bullcoming* are distinguishable factually from the present case and because I believe the holding in *Brown* may be

---

**8.** In an analogous situation to the present case, the Kansas Supreme Court held, in *State v. Appleby*, 289 Kan. 1017, 221 P.3d 525, 552 (2009), a post–*Melendez–Diaz* case, that admitting testimony of an expert witness regarding DNA statistical population data, generated by comparing DNA profiles, did not violate the Confrontation Clause. The appellate court found that DNA profiles are "physical evidence" and, therefore, are non-testimonial. *See Appleby*, 221 P.3d at 551. Simply combining physical evidence, such as DNA, in a database with other physical evidence "does not convert the nature of the evidence, even if the purpose of pooling the profiles is to allow comparisons that identify criminals." *Id.* In other words, the mere fact that humans took part in the creation of a report or database does not convert immediately "raw data" to "testimonial data."

When completed in 1985, serology tests were presumably less automated than similar tests today. Computers have revolutionized such testing, and it is likely, though not known on this record, that true "machine-produced" data was all but non-existent. Holding such tests, common in "cold" cases from the 1980s and 1990s (and earlier), to the same standards of sophisticated forensic testing methods utilized today is analogous to comparing the accuracy of a complex mathematical problem solved by slide rule in the 1980s to the same mathematical problem analyzed today with the use of a high-tech calculator. Of course, there is less human action involved in using a calculator, but that does not mean necessarily that the data is "testimonial" rather than "raw data." Likewise, there is less human action involved inherently in producing a DNA report today than there was in producing a serology report in 1985; however, the data is still "raw" despite the change in the amount of required human action.

applied neatly to the present case, even if the 1985 serology report and Dr. Luttman's testimony regarding the report are considered hearsay (but admissible under Maryland evidence rules), I do not conclude that its admission violated Derr's confrontation rights.

## II. *2004 DNA Results*

In 2002, eighteen years after the alleged rape, FBI personnel conducted chemical tests on the evidence obtained from the PERK. The FBI lab created a DNA profile from the biological evidence, and matched the profile to Derr's DNA profile then-existing in the CODIS database. In order to confirm this match, FBI personnel performed DNA testing on a buccal swab (taken from Derr in 2004). Dr. Luttman testified that her role as supervisor of the 2004 testing was "to do the comparisons between known samples and question samples, to draw all the conclusions, to do the statistical calculations and write the report in this case."

In *Bullcoming, supra,* the Supreme Court recognized that surrogate testimony may violate the Confrontation Clause when the surrogate is ill-equipped to convey what the actual analyst knew or observed, and therefore is unable to attest to any lapses or lies on the analyst's part. *See Bullcoming,* ―― U.S. at ――, 131 S.Ct. at ――, 180 L.Ed.2d at 622. Of particular importance in *Bullcoming,* the certifying analyst was put on unpaid leave prior to the trial and the testifying expert witness did not know the reason for the analyst being put on unpaid leave. *See id.* Further, the prosecution did not notify Bullcoming until the day of the trial that the certifying analyst would not be testifying at trial. *See id.* These issues raised questions concerning the competence and honesty of the certifying analyst. *See id.* Because the surrogate witness did not observe or oversee the testing process in person, she could not confirm that the proper procedures were followed, and, thus, her testimony regarding the certifying expert's analysis did not fulfill Bullcoming's right to confront witnesses against him. *See Bullcoming,* ―― U.S. at ――, 131 S.Ct. at

——, 180 L.Ed.2d at 623.[9] Thus, after *Bullcoming*, the testifying witness must either (1) perform the actual test, or (2) observe or otherwise supervise the test.[10]

The Majority opinion in the present case discounts the 2004 test quickly, noting that Dr. Luttman's team relied on the results of the 2002 test (which I agree was inadmissible). *See* Maj. Op. at 250–51, 29 A.3d at 557–58.[11] The 2004 DNA

---

**9.** The question presented in *Bullcoming* was:

   Does the Confrontation Clause permit the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification *or personally perform or observe the performance of the test* reported in the certification[?]

   *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2713, 180 L.Ed.2d at 619 (emphasis added). By granting certiorari based on a question presented as such, the Majority in *Bullcoming* seemingly left open the possibility that a witness who did not perform, but did *observe* the test, may satisfy the defendant's right to confront accusatory witnesses.

**10.** The Majority in *Bullcoming* noted that "[i]t would be a different case if, for example, a supervisor who observed" a test testified regarding the results of the test or to a report of the results. *Bullcoming,* —— U.S. at ——, 131 S.Ct. at 2722, 180 L.Ed.2d at 629. The Supreme Court declined to discuss the degree of involvement necessary to eliminate Confrontation Clause concerns because the witness in *Bullcoming* had "no involvement whatsoever in the relevant test and report." *Id.*

**11.** In forming this opinion regarding the 2004 test, the Majority opinion seems to ignore Maryland Rule 5–703(a), which states that:

   The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type *reasonably relied upon* by experts in the particular field in forming opinions or inferences upon the subject, the facts or data *need not be admissible* in evidence.

   (Emphasis added.) Even if the 2002 report is inadmissible, courts have often held that DNA testing results are "of the type reasonably relied upon by experts" in the field to draw independent conclusions. *See, e.g., People v. Williams,* 238 Ill.2d 125, 345 Ill.Dec. 425, 939 N.E.2d 268, 277 (2010) ("[The expert witness] testified that it is a commonly accepted practice in the scientific community for one DNA expert to rely on the records of another DNA analyst to complete her work."); *Appleby,* 221 P.3d at 552 ("[A] database and [a] statistical program are accepted sources of information generally relied on by DNA experts."); *Vann v. State,* 229 P.3d 197, 207 (Alaska Ct.App.2010) ("[C]ourts have allowed DNA analysts to give their opinion of the significance of DNA

testing results are distinguishable from the situation in *Bullcoming* in a significant way: Dr. Luttman actually observed the testing and performed the analysis necessary to write the report. Unlike the witness in *Bullcoming*, Dr. Luttman, as the supervisor of the testing, was able to testify as to the procedures followed by the analysts performing the bench work. Further, even though Derr does not raise an issue with the competence or honesty of the testing analysts, Dr. Luttman could attest presumably to the competence or honesty [12] of the analysts under her supervision. Also in contrast to the facts of *Bullcoming*, Derr does not complain that the State did not notify him properly of its intention to call Dr. Luttman, the supervisor of the test rather than the actual testing analyst. The facts of this case, therefore, are distinguishable

---

test results even when those test results were obtained from testing performed by another laboratory analyst.").

**12.** In another post–*Melendez–Diaz* case, *United States v. Boyd*, 686 F.Supp.2d 382, 383 (S.D.N.Y.2010), the defendant objected to the government's use of an expert witness who did not perform the DNA testing, but who made the final determination as to the DNA match. DNA testing, the appellate court explained, is

> the 'gold standard' for forensic testing, [but] is not immune from error or falsification, and, thus, even if the overall error rate in properly conducted DNA testing is extremely low, a defendant must be given, consistent with the mandates of the Constitution, a reasonable opportunity to determine through cross-examination if any such error or falsification is present in any DNA testing admitted into evidence. That opportunity cannot be boundless, however.

*Boyd*, 686 F.Supp.2d at 384 (internal citations omitted). If the testing requires merely that technicians perform mechanical or ministerial tasks, the Court explained, without any indication of falsification or error, the need to call the technician is not a "constitutional necessity." *See id.* The Court held that as long as the testifying expert can testify in detail to the ministerial nature of the steps performed in completing the DNA testing, and to the technical accuracy of the results, the defendant's confrontation rights are not frustrated. *See Boyd*, 686 F.Supp.2d at 385. In any event, falsification or contamination of DNA data would result in "blank spots, but would not otherwise alter the data to form an erroneous DNA profile." *People v. Brown*, 13 N.Y.3d 332, 890 N.Y.S.2d 415, 918 N.E.2d 927, 932 (2009).

Dr. Luttman, as a supervisor, could testify as to the procedures and the ministerial nature of the tasks necessary to complete the DNA profile. In fact, Derr did not indicate that there was a suspected error or falsification in the results.

in several ways from *Bullcoming*, but most notably, in line with the general holding of *Bullcoming*, Dr. Luttman *observed* the 2004 testing and *performed* the analysis necessary to interpret the results and write the report.

Further, in another pre-*Bullcoming*, post-*Melendez–Diaz* case, *Smith v. State*, 28 So.3d 838, 853 (Fla.2009), the defendant asserted that his confrontation rights were violated when the prosecution failed to produce the biologist that performed the DNA sample taken from Smith and the sample obtained from the victim's clothing. The prosecution instead called the FBI supervisor who interpreted the results by evaluating the "raw test results" and compared those results to the sample from the victim's clothing; the supervisor also authored the official report that stated the two samples matched. *See Smith*, 28 So.3d at 854. The appellate court found this situation distinguishable from *Melendez–Diaz* because "the FBI team supervisor who interpreted the data, formulated the conclusions, and prepared the report that implicated Smith in the sexual battery *actually testified during trial.*" *Smith*, 28 So.3d at 855 n. 13. The critical distinction, therefore, from *Melendez–Diaz* is that, in *Smith*, the prosecution presented at trial a witness who interpreted data and formed *independent* conclusions from the bench work completed by analysts; when the prosecution presents a report alone or a mere recitation of the report, *Melendez–Diaz* controls. *See id.*

Because the State's expert witness in the present case observed the 2004 DNA sampling, performed the analysis of the sampling, and wrote the report that indicated that the DNA obtained from Derr matched the DNA obtained from the 1984 PERK, *Melendez–Diaz* does not control. The 2004 test is distinguishable further from *Melendez–Diaz* because Dr. Luttman actually testified at trial and stated that she interpreted the results, did statistical calculations, and wrote the report. Dr. Luttman testified that her role in the 2004 testing included writing the official report, as did the FBI supervisors in *Smith* and *Pendergrass v. State*, 913 N.E.2d 703, 707 (Ind.2009).[13] As such, she did not attest to the accuracy of a

---

13. In *Pendergrass v. State*, 913 N.E.2d 703, 707 (Ind.2009), the prosecution chose to call a laboratory supervisor, rather than a processor, to

"bare-bones" statement, but rather attested to her personal conclusions from observing and interpreting the 2004 test and its results.

I would hold, therefore, on this limited record, that Dr. Luttman was fit to testify to and answer questions (and respond to cross-examination) regarding the 1985 serology report and the 2004 DNA report. Nonetheless, Derr gets a new trial because the 2002 report, offered solely through Dr. Luttman, was inadmissible.

Judge BATTAGLIA authorizes me to state that she joins the views expressed here.

</div>

testify to the results of a DNA test. The appellate court found, as in *Smith*, that the supervisor was permitted to testify as to the accuracy of test results as well as the standard operating procedures of the lab and, as a supervisor, was "perhaps the ideal witness, against whom to lodge such challenges." *Pendergrass*, 913 N.E.2d at 707–08. Because one who supervised lab testing is permitted to testify regarding such testing, *a fortiori* Dr. Luttman, who, *herself*, supervised the testing, interpreted the results, and wrote the report (that she attested to at trial), should be allowed similarly to testify.